IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HOUSTON HOME DIALYSIS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-17-2095 |
| | § | |
| BLUE CROSS AND BLUE SHIELD | § | |
| OF TEXAS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Houston Home Dialysis, a Texas company that provides assisted in-home dialysis services, has sued Blue Cross and Blue Shield of Texas, Horizon Blue Cross and Blue Shield of New Jersey, and Health Care Services Corporation (collectively, "Blue Cross"), alleging that they underpaid medical-benefit claims that Home Dialysis submitted to them. Home Dialysis alleges that six patients received its services and assigned it their health benefits. Home Dialysis allegedly received preauthorizations from Blue Cross, treated the patients, and submitted claims for payment. According to Home Dialysis, Blue Cross paid the claims at lower rates than the patients' insurance policies required. Blue Cross has moved to dismiss under Federal Rule of Civil Procedure 12(b)(1), asserting that Home Dialysis lacks standing to assert one patient's claims because of an anti-assignment clause, and that state sovereign immunity bars the claims arising from two other patients' plans because the State of Texas would be liable to pay the judgment. After a careful review of the pleadings, the motion, response, reply, and the applicable law, the court denies the motion without prejudice so that these arguments may be considered on the more complete record of summary judgment motions or at trial.

**I.      The Background**

a.  **Factual and Procedural History**

Kidney failure, or end-stage renal disease, is treated by dialysis to filter waste out of a patient's blood. Without dialysis, kidney failure leads to death. Hemodialysis, one type of dialysis, involves running blood through a filtering machine and returning it to the patient. A dialyzer, the filtering machine, controls for many factors in the blood and ordinarily requires a nurse or technician to operate. Home Dialysis offers assisted in-home dialysis services, which requires a nurse or technician to travel to the patient's home with a dialyzer machine. Because assisted in-home dialysis involves one-on-one treatment and travel time, it is expensive.

In 2016 and 2017, Home Dialysis treated six patients insured by Blue Cross. (Docket Entry No. 45 at 6). Before treating the patients, Home Dialysis contacted Blue Cross and requested preauthorization. (*Id.*). Blue Cross instructed Home Dialysis "to begin treatments as an 'out-of-network' provider since each patient's Blue Cross policy benefits covered the medically necessary dialysis services." (*Id.*). When Home Dialysis submitted the payment claims, Blue Cross agreed to pay $357 per treatment under the patients' plans. (*Id.* at 9).

In this suit, Home Dialysis alleged that Blue Cross underpaid the claims for four patients' in-home dialysis treatment. (Docket Entry No. 1). Home Dialysis alleged that, as an out-of-network provider, it was owed the "'usual and customary' rates for the same or similar medical services." (*Id.* at 7). Home Dialysis alleged that "'in-network' providers are usually paid $600.00 per treatment," and that "$12,720 is the recognized usual and customary charge for staff-assisted home-dialysis treatments." (*Id.* at 5). Blue Cross paid only $357 per treatment. (*Id.* at 5). Invoking the patients' assignments of their health-plan benefits, Home Dialysis asserted claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and Texas

common law, alleging that Blue Cross owed at least $450 per treatment but had reduced the $600 in-network fee by more than 25%. (*Id.* at 11–13).

Home Dialysis amended the complaint in December 2017 to assert the rights of two additional patients insured by Blue Cross. (Docket Entry No. 13 at 8–9, 13). The amended complaint alleged that Blue Cross preauthorized the treatments, that the patients assigned their benefits to Home Dialysis, that Home Dialysis submitted the claims to Blue Cross, and that Blue Cross underpaid. (*Id.* at 4–8). The ERISA and Texas law claims were the same. (*Id.* at 9–25).

Blue Cross moved to dismiss on the grounds that: the amended complaint failed to state a claim; Home Dialysis alleged insufficient facts for standing; Home Dialysis could not assert claims against Blue Cross under both 29 U.S.C. § 1132(a)(1) and (a)(3); ERISA preempted the Texas-law claims; and Blue Cross was not a plan administrator amenable to suit under 29 U.S.C. §§ 1132(c) and 1133(2). (Docket Entry No. 21 at 11–12). Home Dialysis responded that the amended complaint allegations were sufficient, but agreed that it could not recover under both § 1132(a)(1) and (a)(3) and that Blue Cross was not a plan administrator for § 1132(c) purposes. (Docket Entry No. 28 at 9–13). Home Dialysis contended that the Fifth Circuit has not resolved whether a plan administrator can be sued under § 1133(2) and that ERISA did not preempt the Texas-law claims because they arose from non-ERISA plans. (*Id.* at 14–22).

The court denied the motion to dismiss in part, finding that Home Dialysis had alleged sufficient facts to state a plausible claim for relief as to its denial-of-benefits claim under § 1132(a)(1), and that the record contained insufficient evidence to decide the standing question. (Docket Entry No. 39 at 5–7). The court granted the motion to dismiss, with prejudice, on the claims under §§ 1132(a)(3) and 1133(2). (*Id.* at 7–13). The court dismissed without prejudice the

3

Texas-law claims as preempted, with leave for Home Dialysis to amend to specify which patients' plans were governed by Texas law. (*Id.* at 15–18).

Home Dialysis amended the complaint, seeking to cure the deficiencies the court had identified in its June 2018 memorandum and opinion. (Docket Entry No. 45). The second amended complaint clarified that the University of Texas system insured two of the patients, while the other patients had plans subject to ERISA. (*Id.* at 6). In Count 1, Home Dialysis sought to enforce the ERISA plan terms as to out-of-network claims. (*Id.* at 11–12). In Count 2, Home Dialysis asserted Texas-law claims to enforce the non-ERISA plan terms relating to out-of-network claims. (*Id.* at 12). As to standing, the second amended complaint alleged that the patients had "signed an assignment of benefits and a designation of authorized representative agreement to Houston Home Dialysis." (*Id.* at 9).

The second amended complaint alleged:

37. Before scheduling or performing any medical services, Houston Home Dialysis called Blue Cross at the telephone number indicated on each covered member's or beneficiary's healthcare card to verify the member or beneficiary's coverage and eligibility, including out-of-network benefit coverage and coverage for the specific healthcare services performed by Houston Home Dialysis. Blue Cross never told Houston Home Dialysis that staff-assisted home dialysis was not covered or that they would not pay for it.

38. Upon receipt of Blue Cross' authorizations, and in reasonable reliance on those authorizations, Houston Home Dialysis performed medical services for the six covered members and beneficiaries whose benefit claims are at issue in this lawsuit.

39. After medical services were performed, Houston Home Dialysis properly and timely submitted claims, together with all necessary supporting documents and information through Blue Cross' designated claims handling channels.

40. Blue Cross, upon receiving these claims, either denied them, underpaid them, or otherwise failed to pay them in accordance with the terms and conditions of the covered member's and/or beneficiary's Plans.

4

(*Id.* at 10).

Blue Cross moved to dismiss under Rule 12(b)(1), arguing that Home Dialysis lacked standing to assert Patient 6's claim (Count 1), because her insurance plan contained an anti-subrogation clause. (Docket Entry No. 36 at 2). Blue Cross argued that state sovereign immunity barred the claims of Patients 4 and 5 (Count 2), because the University of Texas would have to pay any judgment against Blue Cross. (*Id.* at 6). Home Dialysis responded that Blue Cross had waived the anti-assignment argument by failing to raise it earlier and that the University of Texas would not be responsible for a judgment against Blue Cross. (Docket Entry No. 53 at 7). Blue Cross replied that Home Dialysis had not told Blue Cross of the patients' assignments until the litigation and that the University was responsible for paying "all benefits owed to its members under the plan." (Docket Entry No. 54 at 3–5).

The parties submitted documents with the motion to dismiss, response, and reply, including Patient 6's insurance plan, the University's request for proposals from plan administrators, Blue Cross's agreement with the University, and a declaration of Home Dialysis's president. (Docket Entries No. 46-1–46-3, 47, 53-1). The motion, the response, the reply, and applicable case law are considered below.

## II. The Standard of Review

Blue Cross raised arguments based on state sovereign immunity, which is jurisdictional, and based on prudential standing, which is not. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature."); *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 474 n.4. (5th Cir. 2013) ("[P]rudential standing, while not jurisdictional, nonetheless affects justiciability."); *Lewis v. Knutson*, 699 F.2d 230, 236 (5th Cir. 1983) ("[T]he prudential

limitation goes to the court's administrative *discretion* to hear the case." (emphasis in original)). Blue Cross argued that Home Dialysis lacks "standing" to assert a claim for Patient 6's treatment because her plan prohibited assignment. (Docket Entry No. 46 at 8). Under prudential standing, "a plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015) (quotation omitted); *see also St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 539 (5th Cir. 2009) (describing prudential standing requirements).

A motion to dismiss based on sovereign immunity is properly considered under Federal Rule of Civil Procedure 12(b)(1). *Warnock v. Pecos Cty., Tex.*, 88 F.3d 341, 343 (5th Cir. 1996) ("Because sovereign immunity deprives the court of jurisdiction, the claims barred by sovereign immunity can be dismissed only under Rule 12(b)(1) and not with prejudice."). "Unlike a dismissal for lack of constitutional standing, which should be granted under Rule 12(b)(1), a dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6)." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011); *see White Oak Realty, LLC v. U.S. Army Corp of Eng'rs*, No. 13-4761, 2014 WL 4387317, at *6 n.68 ("[P]rudential standing—in whatever form it still exists—is properly considered on a motion to dismiss for failure to state a claim upon which relief can be granted."). The court considers the prudential standing argument under Rule 12(b)(6) and the sovereign immunity argument under Rule 12(b)(1).

   a.   **The Rule 12(b)(1) Standard**

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), a court must "take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Griener v. United States*, 900 F.3d 700, 703 (5th Cir. 2018) (quoting

*Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008)). "This analysis is generally confined to a review of the complaint and its proper attachments." *Lane*, 529 F.3d at 557. Under Rule 12(b)(1), however, "the court may find a plausible set of facts by considering any of the following: (1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* (quoting *Barrera–Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)).

The Fifth Circuit distinguishes between a "facial" and "factual" attack on a complaint under Rule 12(b)(1). *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). If a defendant moves to dismiss, without more, "the trial court is required merely to look at the sufficiency of the allegations in the complaint because they are presumed to be true." *Id.* The complaint stands "if the jurisdictional allegations are sufficient." *Id.* Where a defendant "submits affidavits, testimony, or other evidentiary materials," the plaintiff must also "submit facts through some evidentiary method and has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Id.* "In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *see Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) ("When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations."). "Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Ramming*, 281 F.3d at 161.

    **b.**  **The Rule 12(b)(6) Standard**

Rule 12(b)(6) requires dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8's requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must contain "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).

To withstand a Rule 12(b)(6) motion, a "complaint must allege 'more than labels and conclusions,'" and "a formulaic recitation of the elements of a cause of action will not do." *Norris v. Hearst Tr.*, 500 F.3d 454, 464 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). "[A] complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum

8

expenditure of time and money by the parties and the court." *Id.* (quotation and alteration omitted).

In considering a motion to dismiss for failure to state a claim, the court is to consider "the contents of the pleadings, including attachments." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Documents "attache[d] to a motion to dismiss are considered part of the pleadings, if they are referred to in the plaintiff's complaint and are central to [its] claim." *Id.* at 498–99 (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). The court may also "take judicial notice of matters of public record." *Norris*, 500 F.3d at 461 n.9.

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff a chance to amend under Rule 15(a) before dismissing the action with prejudice, unless it is clear that to do so would be futile. *See Carroll v. Fort James Corp.*, 470 F.3d 1171, 1175 (5th Cir. 2006) ("[Rule 15(a)] evinces a bias in favor of granting leave to amend." (quotation omitted)); *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."). A court may deny a motion to amend for futility if an amended complaint would fail to state a claim upon which relief could be granted. *Pervasive Software Inc. v. Lexware GmbH & Co.*, 688 F.3d 214, 232 (5th Cir. 2012). The decision to grant or deny leave to amend "is entrusted to the sound discretion of the district court." *Id.*

### III. Standing

Blue Cross claimed that Home Dialysis lacks standing to sue because Patient 6's contract forbids assignments. (Docket Entry No. 46 at 4–5). In support, Blue Cross submitted Patient 6's insurance plan. (Docket Entry No. 46-1). The plan's anti-assignment clause states that "[r]ights and benefits under the Plan shall not be assignable, either before or after services and supplies are provided." (Docket Entry No. 46-2 at 11). The court may consider Patient 6's insurance plan because it is central to, and referred to in, the second amended complaint. *Collins*, 224 F.3d at 498–99.

This provision is presumptively enforceable. *La. Health Servs. & Indem. Co. v. Rapides Healthcare Sys.*, 461 F.3d 529, 537 (5th Cir. 2006), *cert. denied* 549 U.S. 1279 (2007) ("[A]n anti-assignment provision in a plan is permissible under ERISA."); *Encompass Office Sols., Inc. v. La. Health Serv. & Indem. Co.*, No. 3:11-cv-1471, 2013 WL 12310676, at *10 (N.D. Tex. Sept. 17, 2013) ("Anti-assignment clauses in ERISA plans are generally enforceable."); *cf. El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 810–11 (Tex. 2012) ("The role of the courts is not to protect parties from their own agreements, but to enforce contracts that parties enter into freely and voluntarily."). Home Dialysis responded that Blue Cross has "waived the anti-assignment provision and is estopped from raising it." (Docket Entry No. 53 at 10).

**a.     Waiver**

"Fifth Circuit case law distinguishes estoppel from waiver, and 'defines waiver as a voluntary or intentional relinquishment of a known right.'" *Gilmour v. Intertek USA, Inc.*, No. 3:16-cv-00266, 2018 WL 3059682, at *7 (S.D. Tex. May 30, 2018) (quoting *High v. E-Systems Inc.*, 459 F.3d 573, 581 (5th Cir. 2006)). Home Dialysis must show that Blue Cross "voluntarily and knowingly relinquished [the] right to rely on the Plan's anti-assignment language through [its]

10

course of conduct." *Id.* Based on the complaint's allegations, Home Dialysis cannot do this. Because the complaint alleges no facts supporting an inference that Blue Cross intended to relinquish the anti-assignment clause, this argument fails.

      **b.**     **Estoppel**

"Unlike constitutional standing," a defendant may waive a challenge based on prudential standing "if not asserted timely." *Encompass Office Sols., Inc. v. Conn. Gen. Life Ins. Co.*, No. 3:11-cv-02487, 2017 WL 3268034, at *13 (N.D. Tex. July 31, 2017) (quoting *Bd. of Miss. Levee Comm'rs v. EPA*, 675 F.3d 409, 417–18 (5th Cir. 2012)). In *Hermann Hospital v. MEBA Medical & Benefits Plan*, 959 F.2d 569, 574 (5th Cir. 1992), the Fifth Circuit considered whether an insurer was estopped from enforcing an anti-assignment clause. The case concerned a hospital patient who assigned her insurance benefits to the hospital in a written agreement. *Id.* The hospital told the patient's insurer that she had assigned her benefits, and the insurer confirmed that her plan covered the treatment. *Id.* During the patient's six-month stay, the hospital and insurer continuously communicated about payment, but the insurer declined to pay pending an investigation. *Id.* After three years, the hospital sued. *Id.* At trial, the insurer claimed that an anti-assignment clause in the patient's plan precluded the hospital from recovering. *Id.*

The Fifth Circuit estopped the insurer from enforcing the anti-assignment clause "because of [the insurer's] protracted failure to assert the clause when [the hospital] requested payment pursuant to a clear and unambiguous assignment of payments for covered benefits." *Id.* at 575. In the Fifth Circuit's view, "it was unreasonable for [the insurer] to lie behind the log for three years without once asserting the anti-assignment clause, of which [the hospital] had no knowledge, while duplicitously dragging out the ongoing negotiations to liquidate the claim." *Id.* at 574. The insurer

11

was responsible for "notify[ing the hospital] of [the anti-assignment clause] if it intended to rely on it to avoid any attempted assignments." *Id.*

Following *Hermann Hospital*, courts have equitably estopped insurers from asserting anti-subrogation clauses only if the treatment provider obtained a clear and unambiguous assignment, confirmed coverage with the insurer, and the insurer failed to inform the provider of the anti-subrogation clause after it became clear that the provider was relying on the assignment. *See Encompass Office Sols.*, 2017 WL 3268034, at *13; *Shelby Cty. Health Care Corp. v. Genesis Furniture Indus., Inc.*, 100 F. Supp. 3d 577, 581–82 (N.D. Miss. 2015); *Sleep Lab at W. Hous. v. Tex. Children's Hosp.*, No. H-15-0151, 2015 WL 3507894, at *5 (S.D. Tex. June 2, 2015); *La. Health Serv. & Indem.*, 2013 WL 12310676, at *10.

In this case, the second amended complaint alleged:

> Before scheduling or performing any medical services, Houston Home Dialysis called Blue Cross at the telephone number indicated on each covered member's or beneficiary's healthcare card to verify the member or beneficiary's coverage and eligibility, including out-of-network benefit coverage and coverage for the specific healthcare services performed by Houston Home Dialysis. Blue Cross never told Houston Home Dialysis that staff-assisted home dialysis was not covered or that they would not pay it.

(Docket Entry No. 45 at 10). These allegations, if proven, would show that Home Dialysis called Blue Cross to preauthorize the in-home dialysis treatment, but not that Home Dialysis informed Blue Cross of Patient 6's assignment before the litigation.[1] *Hermann Hospital* turned on an insurer's failure to notify a medical provider of an anti-assignment clause despite knowing that the provider had a "clear and unambiguous assignment." *Hermann Hosp.*, 959 F.2d at 574–75. In this case,

---

[1] In response to the motion to dismiss, Home Dialysis submitted an affidavit from its president, Akihiro Mochizuki. (Docket Entry No. 53-1). The court cannot consider this document on a Rule12(b)(6) motion. Even if it could, the affidavit asserts only that Blue Cross preauthorized Patient 6's treatment at Home Dialysis's request, not that Home Dialysis informed Blue Cross of the assignment. (*Id.* at 1).

12

neither the complaint nor the attachments properly considered plausibly plead facts showing that Blue Cross knew that Home Dialysis had been assigned Patient 6's benefits. The complaint allegations are only that Home Dialysis confirmed coverage with Blue Cross. That Home Dialysis sought and obtained preauthorization did not put Blue Cross on notice that Patient 6 had assigned her health benefits to Home Dialysis. The complaint allegations are insufficient to warrant the equitable remedy Home Dialysis seeks at this stage of the litigation.

While Patient 6's plan contains a presumably enforceable anti-assignment clause, discovery could reveal that Blue Cross knew of Patient 6's assignment but failed to tell Home Dialysis about the anti-assignment clause. If so, an equitable remedy might be warranted.

The court denies the motion to dismiss, without prejudice, so that the parties may raise this issue at summary judgment or at trial, on a more complete record. *See Grand Parkway Surgery Ctr., LLC v. Health Care Serv. Corp.*, No. H-15-0297, 2015 WL 3756492, at *2 (S.D. Tex. June 16, 2015) ("It is necessary and appropriate in this case to consider the effect of the anti-assignment clauses and the waiver and estoppel issues on a Motion for Summary Judgment when the plans, the assignments, and evidence regarding the parties' dealings are in the record. At the current stage, the Court concludes that Plaintiff has adequately alleged that it obtained a valid Assignment of Benefits from each patient and, as a result, the Court denies the Motion to Dismiss for lack of jurisdiction.").

## IV. Sovereign Immunity

Home Dialysis submitted a declaration of its president in response to the motion to dismiss based on sovereign immunity. (Docket Entry No. 53). The court may consider the declaration and other matters of fact and grant the motion to dismiss only if Home Dialysis has not shown any set of facts entitling it to relief. *Ramming*, 291 F.3d at 161.

Absent an unequivocal waiver or congressional abrogation, the Eleventh Amendment bars suits in federal court by a state's citizens against their own state or a state agency or department. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 669–70 (1999); *Clark v. Tarrant Cty., Tex.*, 798 F.2d 736, 743 (5th Cir. 1986) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)); *see* U.S. CONST. amend. XI. Eleventh Amendment immunity extends to "any state agency or entity deemed an 'alter ego' or 'arm' of the state." *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 326 (5th Cir. 2002) (citing *Vogt v. Bd. of Comm'rs*, 294 F.3d 684, 688–89 (5th Cir. 2002)). The question is whether the lawsuit "is effectively against the sovereign state." *Earles v. State Bd. of Certified Pub. Accountants of La.*, 139 F.3d 1033, 1037 (5th Cir. 1998).

The Fifth Circuit has identified six factors as helpful to answer this question. The factors are: (1) "[w]hether the state statutes and case law view the agency as an arm of the state"; (2) the "source of the entity's funding"; (3) the "entity's degree of local autonomy"; (4) "[w]hether the entity is concerned primarily with local as opposed to statewide, problems"; (5) "[w]hether the entity has authority to sue and be sued in its own name"; (6) "[w]hether the entity has the right to hold and use property." *U.S. ex rel. Barron v. Deloitte & Touche, LLP*, 381 F.3d 438, 440 (5th Cir. 2004) (quoting *Hudson v. City of New Orleans*, 174 F.3d 677, 679 (5th Cir.1999)).

No single factor is determinative. *Barron*, 381 F.3d at 440. They aim to help the court "determine 'if the state is the real, substantial party in interest because the suit seeks to impose a liability which must be paid from public funds in the state treasury.'" *Id.* (quoting *Hudson*, 174 F.3d at 681); *see Carter v. Seamans*, 411 F.2d 767, 770 (5th Cir. 1969) ("The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to

restrain the Government from acting, or to compel it to act.'" (quoting *Dugan v. Rank*, 372 U.S. 609, 620 (1963))). Because the "Eleventh Amendment exists mainly to protect state treasuries," the "weightiest factor" is the "source of the entity's funding" or, in other words, "whether the state would be liable for a judgment against the defendant.'" *Barron*, 381 F.3d at 440 (quoting *Hudson*, 174 F.3d at 687). The third and fourth factors are "difficult to evaluate in the context of a private corporation." *Id.* at 441.

The Texas Legislature has authorized the University of Texas system to provide health insurance benefits to "recognize and protect the investment of the [University] in each employee by promoting and preserving economic security and good health among employees." TEX. INS. CODE ANN. § 1601.002(4). The Legislature charged the University with "implement[ing] a uniform program" and "determin[ing] basic procedural and administrative practices for insurance coverage." *Id.* § 1601.051. For full-time employees, the University may contribute "the full cost of basic coverage for the employee" and " not more than 50 percent of the cost of dependent coverage." *Id.* § 1601.201(b)(1)–(2).

In implementing this mandate, the University issued a proposal soliciting the services of administrators for a health insurance plan called "UT Select PPO." (Docket Entry No. 46-3). Blue Cross responded and the University selected Blue Cross as the plan's administrator. The University and Blue Cross executed a service contract incorporating the Proposal and defining their relationship. (Docket Entry No. 47). The Proposal stated:

> The UT SELECT PPO is financed on a fully self-funded basis. The contract to be executed in accordance with this document shall involve no insurance or reinsurance. The contract shall be for administrative services, claims processing, network management and credentialing, utilization review, and disease management services

15

> as described within this [Proposal]. The cost to meet the requirements described in this [Proposal] shall be recovered by the [administrator] only by making provision for such expense in the [administrator's] Administrative Fee Proposal included with the response to this [Proposal].

(Docket Entry No. 46-3 at 29). Interpreting similar language, the Supreme Court of Texas has explained that, under a self-funded benefit plan, the employer

> assumes the risk of providing health insurance to its employees, instead of ceding the risk to a third-party insurance company. The employer then either sets aside funds for its employees' covered medical expenses or pays for such expenses out of its general accounts. Self-funded plans typically hire third parties to administer the plan and often purchase stop-loss insurance to limit financial exposure to catastrophic loss.

*Tex. Dep't of Ins. v. Am. Nat'l Ins. Co.*, 410 S.W.3d 843, 846 (Tex. 2012). The Proposal required that the administrator set a fee "adequate to cover costs incurred for the performance of all services described within this [Proposal]." (Docket Entry No. 46-3 at 29). The administrator was to "process and pay all claims submitted under UT SELECT" and maintain "funds which are sufficient to provide for the costs incurred." (*Id.* at 30). Each week, the administrator had to "present an invoice to the [University] for claim payments made." (*Id.*). The University would then reimburse the administrator. (*Id.*). As to liability, the Proposal provided:

> Although UT SELECT is self-funded, it is the intent of the [University] that the [administrator] assume, pursuant to the Contract, fiduciary duties and liability for all of its actions associated with the performance of its duties under the Contract. . . . The [administrator] must ensure timely and accurate payment of UT SELECT claims.

(*Id.* at 32). The administrator assumed "100% liability for incorrect payments which result from policy or [University] errors attributable to the [administrator] in whole or part," but the administrator could not litigate overpayments "unless authorized" by the University. (*Id.* at 52).

In accordance with the Proposal, Blue Cross's Contract with the University required it to

16

process and pay claims in a timely fashion. (Docket Entry No. 47). The Contract included the following indemnification provision:

> To the fullest extent permitted by law, [Blue Cross] will and does hereby agree to indemnify, protect, defend with counsel approved by [the University], and hold harmless [the University], and [University] affiliated enterprises, regents, officers, directors, attorneys, employees, representatives and agents (collectively "Indemnitees") from and against all damages, losses, liens, causes of action, suits, judgments, expenses, and other claims of any nature, kind, or description, including reasonable attorneys' fees incurred in investigating, defending or settling any of the foregoing (collectively "Claims") by any person or entity, arising out of, caused by, or resulting from [Blue Cross's] performance under or breach of this Agreement and that are caused in whole or in part by any negligent act, negligent omission or willful misconduct of [Blue Cross], anyone directly employed by [Blue Cross] or anyone for whose acts [Blue Cross] may be liable.

(*Id.* at 5–6). The Contract continued: "Except for [the University's] obligation (if any) to pay [Blue Cross] certain fees and expenses, [the University] will have no liability to [Blue Cross] or to anyone claiming through or under [Blue Cross] by reason of the execution or performance of this Agreement." (*Id.* at 12 (emphasis omitted)). The Contract made clear that "[Blue Cross] is an independent contractor and is not a state employee, partner, joint venturer, or agent of [the University]." *Id.* at 6.

Blue Cross could be entitled to sovereign immunity if the University would be liable for a judgment against it. *Barron*, 381 F.3d at 440. But the Contract states that the Blue Cross has indemnified the University, and the Proposal provides that Blue Cross has assumed "100% liability for incorrect payments." (Docket Entry No. 46-3 at 52). Based on the Proposal and Contract, the University would not be liable for a judgment against Blue Cross for claim underpayment because Blue Cross has "100% liability for incorrect payments." (*Id.*).[2] On the current record, the court

---

[2] Blue Cross cited cases dealing with the Federal Employees Health Benefits Act and other federal frameworks. (Docket Entry No. 46 at 9–10). Those cases concern the specific contract and statutory relationships between the federal government and plan administrators. *See Mentis El Paso v. Health Care*

17

cannot decide this issue because it is unclear whether Patients 4 and 5 were insured under the UT Select PPO, or some other University plan. This matters, because the University's liability for judgments against Blue Cross might differ depending on the contract arrangements for one plan or another. Again, the court denies the motion to dismiss, without prejudice, so that the parties may supplement the record and raise this issue at summary judgment or, if appropriate, at trial.

## V. Conclusion

The motion to dismiss is denied, without prejudice. (Docket Entry No. 46). Blue Cross may raise the prudential standing and sovereign immunity issues at summary judgment or at trial.

SIGNED on October 22, 2018, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

---

*Serv. Corp.*, 58 F. Supp. 3d 745, 752–56 (W.D. Tex. 2014); *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, No. 3:12-cv-1607, 2014 WL 360291, at *5–*6 (N.D. Tex. Feb. 3, 2014). They are not dispositive in this case.

In *Kirby v. Health Care Service Corporation*, 88 F. Supp. 3d 717, 718–19 (W.D. Tex. 2015), a more analogous case, the district court considered whether Blue Cross was entitled to sovereign immunity when serving as an administrator for a health insurance plan funded by the Texas School Employees Uniform Group Coverage Trust Fund. Blue Cross had agreed to indemnify the Trust for liabilities arising out of its contract performance, and the contract stated that Blue Cross was not the Trust's agent. *Id.* at 721. The district court, however, found that Blue Cross was entitled to sovereign immunity, pointing to contract language that gave the Trust final decision-making authority as to "whether or not coverage exists" and made it "solely responsible for all funding, payments, and liabilities." *Id.* at 721–22; *see also McAllen Anesthesia Consultants, P.A. v. United Healthcare Servs., Inc.*, No. 7:14-cv-913, 2015 WL 9257154, at *8 (S.D. Tex. Dec. 14, 2015) (plan administrator was entitled to sovereign immunity because the Employees Retirement System of Texas was "responsible for paying claims for Plan benefits, which are paid with State funds"). The current case differs because the Proposal and Contract require that Blue Cross "review claims for eligibility" and bear "100% liability for incorrect payments." (Docket Entry No. 46-3 at 52–53).